# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 17-cv-295-SMY |
| IYMAN FARIS, | ) ) ) |
| Defendant. | ) ) |

# REDACTED MEMORANDUM AND ORDER[1]

**YANDLE, District Judge:**

Iyman Faris was born in Karachi, Pakistan in 1969 (Doc. 16). He entered the United States at New York, New York in March 1994, using a passport and visa belonging to Iyman al-Ibrahim al-Ali, whom he had previously met in Bosnia (Doc. 16, ¶ 7; Doc. 66-1, ¶ 4). In July, 1994, Faris filed a Form I-589 Request for Asylum ("asylum request") with the former Immigration and Naturalization Service ("INS") in which he claimed to have arrived in the United States at Buffalo, New York in May 1994 after leaving his home country (Doc. 66-2, at pp. 8-12).

Faris married Geneva Bowling, a U.S. citizen, while his asylum request was pending (Doc. 66-2, at pp. 13-18). In December 1995, Bowling filed a Form I-130 Petition for Alien Relative with INS, seeking to have Faris recognized as an immediate family member of a U.S. citizen. *Id*. Faris contemporaneously filed a Form I-485 Application to Register Permanent Residence or Adjust Status ("adjustment of status application"). *Id*. As a result of Faris' adjustment of status

---

[1] Out of an abundance of caution and given that the parties have cited Faris' plea agreement and the Court has quoted from it in this Memorandum and Order, the Court will issue a partially redacted public version and a sealed version of its ruling on the Government's Motion for Summary Judgment.

application, his asylum request, received by INS on December 18, 1995, was never adjudicated. *Id.; see also* Doc. 66-4, ¶ 3).

An immigration officer interviewed Faris under oath in connection with his adjustment of status application on February 20, 1996 (Doc. 66-3, ¶ 9). During the interview, the officer questioned Faris about his answers on the Form I-485 (Doc. 66-2, at p. 15-18; Doc. 66-3, ¶ 9). Faris gave the officer information consistent with those answers, including that he never knowingly committed a crime of moral turpitude for which he had not been arrested and had never, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the United States or any other immigration benefit (Doc. 66-2, p. 17). Following the interview, INS approved Faris' Form I-485 and adjusted his status to permanent resident in March 1996. *Id*.

Faris filed a Form N-400 Application for Naturalization ("naturalization application") on January 14, 1999 in which he represented that he had never given false testimony for the purpose of obtaining an immigration benefit or knowingly committed a crime for which he had not been arrested (Doc. 66-2, pp. 19-22). During his naturalization interview, Faris made statements under oath consistent with the information provided in his application. *Id*.; *see also* Doc. 66-3, ¶ 7). At the conclusion of the interview, Faris again signed the Form N-400 (as annotated during the interview) in the presence of Chase Robinson, the interviewing immigration officer, averring the amended application was true and correct (Doc. 66-2, at p. 22; Doc. 66-3, at ¶ 11). Based on Faris' sworn statements, Robinson approved his naturalization application the same day. *Id*. Faris took the Oath of Allegiance and became a naturalized citizen on December 16, 1999 (Doc. 66-3, ¶ 13).

The United States Secretary of State designated al Qaeda a foreign terrorist organization under 8 U.S.C. § 1189 on October 8, 1999 (Doc. 66-10). In 2000, Faris traveled to Afghanistan where he met Osama bin Laden and other high-ranking members of al Qaeda at an al Qaeda

training camp (Doc. 66-5, ¶ 2; 66-6, pp. 31-31). At the request of an al Qaeda member, Faris researched information about ultralight airplanes and provided the results of his research to a senior al Qaeda leader (Doc. 66-5, ¶ 3; Doc. 66-6, pp. 32-33). Between 2000 and 2001, also at the request of an al Qaeda member, Faris arranged to extend several airline tickets issued to al Qaeda operatives through a travel agent located in Karachi, Pakistan (Doc. 66-6, p. 34). After returning to the United States in 2002, Faris researched the use of "gas cutters," evaluated the practicality of a plot to collapse a suspension bridge in New York using gas cutters, and communicated this information to his al Qaeda contact in Pakistan via coded messages (Doc. 66-5, ¶¶ 8-11; Doc. 66-6, pp. 35-38).

In March 2003, Faris was contacted by agents from the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force (Doc. 66-7). He gave numerous interviews to FBI agents between March and April 2003 regarding his knowledge, involvement, and relationship with al Qaeda and the organizations' various terrorist plots (Doc. 66-7). Subsequently, on May 1, 2003, by written plea agreement, Faris waived indictment and pleaded guilty to a two-count criminal information in the United States District Court for the Eastern District of Virginia (Doc. 76-1); he was convicted of providing material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B (Count 1) and conspiring to provide material support to al Qaeda, in violation of 18 U.S.C. § 371 (Count 2) (Doc. 66-9). Faris was sentenced on October 28, 2003 to 240 months imprisonment, consisting of 60 months on Count 1 and a consecutive term of 180 months on Count 2. *Id*.

On March 20, 2017, the United States of America (the "Government") filed this action pursuant to 8 U.S.C. § 1451(a), asserting the following grounds for denaturalization and the revocation of Faris' U.S. citizenship:

> Count I: Naturalization procured by concealment of material facts and willful misrepresentation by affiliation with al Qaeda within five years after naturalization;
>
> Count II: Naturalization procured by concealment of material facts and willful misrepresentation by concealment of affiliation with extremist groups in Pakistan, Afghanistan, and Bosnia;
>
> Count III: Illegal procurement of United States citizenship by not being lawfully admitted for permanent residence; and
>
> Count IV: Illegal procurement of United States citizenship by lack of good moral character.

(Doc. 1). The Government moved for judgment on the pleadings (Doc. 24) which the Court denied based on the insufficiency of the record (Doc. 37). The record is now fully developed and the Government's Motion for Summary Judgment on Counts I, III, and IV (Doc. 66) is ripe for resolution.[2]

## **Discussion**

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

---

[2] The parties quibble about outstanding discovery disputes in their summary judgment briefings. Those discovery disputes were fully resolved by Magistrate Judge Sison following the summary judgment briefing and the Government was directed to disclose unredacted copies of the disputed documents (Doc. 77). Faris was given leave to file a supplement to his opposition to the Government's motion for summary judgment based on the newly disclosed documents but failed to do so (*see* Doc. 81).

Appropriately so, the Government carries a heavy burden of proof when attempting to divest a naturalized citizen of his or her citizenship. *United States v. Firishchak*, 468 F.3d 1015, 1023 (7th Cir. 2006). In order to prevail, it must produce evidence justifying revocation that is "clear, unequivocal, and convincing and not leave the issue in doubt." *Fedorenko,* 449 U.S. at 505; *see also Kungys v. United States,* 485 U.S. 759, 776 (1988). If the Government meets its burden, the Court is compelled to enter a judgment of denaturalization and revoke citizenship. *Fedorenko,* 449 U.S. at 517.

The Immigration and Nationality Act provides for denaturalization of citizens whose citizenship orders and certificates of naturalization were either (1) "illegally procured" or (2) "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Additionally, under 8 U.S.C. § 1451(c), affiliation within five years of naturalization with an organization with which prior affiliation would have been a bar to naturalization is *prima facie* evidence that naturalization was obtained by willful misrepresentation. In the absence of countervailing evidence, proof of affiliation with a prohibited organization is sufficient to revoke and set aside the order admitting the person to citizenship and cancel the certificate of naturalization. *Id*.

Here, the Government moves for summary judgment on three independent bases. First, it asserts that Faris' affiliation with al Qaeda within five years after naturalizing is *prima facie* evidence that he did not meet the prerequisites for naturalization at the time he naturalized; he was not attached to the principles of the Constitution and well-disposed to the good order and happiness of the United States (Count I). Next, the Government contends that Faris illegally procured his naturalization because he had not been lawfully admitted for permanent residence (Count III). Finally, the Government argues Faris lacked the requisite good moral character for naturalization,

as evidenced by false testimony given during his adjustment of status and naturalization interviews, and that therefore, he illegally procured his citizenship (Count IV).

*Count I – Denaturalization under 8 U.S.C. § 1451(c)*

A prohibited organization is one that advocates or teaches:

(A) the overthrow by force or violence or other unconstitutional means of the Government of the United States or of all forms of law; or (B) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers . . . of the Government of the United States or of any other organized government because of his or their official character; or (C) the unlawful damage, injury, or destruction of property; or (D) sabotage . . . .

8 U.S.C. § 1424(a)(4). It is undisputed that less than one year after become a naturalized citizen, Faris met senior members of al Qaeda and began providing information to the terrorist organization. It is also undisputed that between 2000 and 2003, he researched ultralight aircrafts and provided the results of his research to an al Qaeda operative; arranged the extension of several airline tickets issued to al Quada operatives; researched the use of "gas cutters"; evaluated the practicability of a plot to collapse a suspension bridge in New York using gas cutters; and communicated this information to his al Qaeda contact in Pakistan via coded messages. Faris later pled guilty to and was convicted of knowingly providing material support to a foreign terrorist organization and conspiring to provide material support to a foreign terrorist organization. Faris' undisputed affiliation with al Qaeda, beginning less than 1 year after his naturalization, is *prima facie* proof he obtained citizenship in this country by willful misrepresentation. As such, absent countervailing evidence, his citizenship is subject to revocation.

Faris does not deny his affiliation with al Qaeda. Instead, he maintains that by pursuing this action, the Government is in breach of paragraph 10 of its 2003 Plea Agreement with him which states as follows:

# REDACTED

the Agreement states explicitly, "This written agreement constitutes the complete plea agreement between the United States, the defendant, and defendant's counsel. The United States has made no promises or representations except as set forth in writing in this plea agreement." (Doc. 76-1, paragraphs 17, 18). And, during his plea colloquy, Faris acknowledged that he "did not have any side deals or side understandings of any kind with any prosecutor, investigator, or anybody else concerning this case" (Doc. 66-6, at pp. 12-13).

Because Faris has failed to proffer any relevant countervailing evidence to rebut the statutory presumption triggered by his affiliation with al Qaeda, his naturalization must be revoked pursuant to 8 U.S.C. § 1451(c). That said, the Court finds for completeness, the remaining grounds for denaturalization raised by the Government also warrant discussion.

### *Count III – Citizenship Illegally Procured by Not Being Lawfully Admitted*

Citizenship is "illegally procured" within the meaning of 8 U.S.C. § 1451(a) when it is procured by a person who was statutorily ineligible for naturalization. *Fedorenko,* 449 U.S. at 507. Relatedly, an individual is admitted for permanent residence on adjustment of status. 8 U.S.C. § 1255(a), (b). To be lawfully admitted, the adjustment must be in compliance with substantive legal requirements. *Estrada-Ramos v. Holder*, 611 F.3d 318, 321 (7th Cir. 2010). One such requirement is that the applicant be admissible to the United States for permanent residence. 8 U.S.C. § 1255(a)(2).

An individual is inadmissible if, "by fraud or willfully misrepresenting a material fact, [he] seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter . . . ." 8 U.S.C. § 1182(a)(6)(C)(i). A misrepresentation is material if it has a natural tendency to influence the decision of an immigration official. *Kungys*, 485 U.S. at 771. In other words, the Government does not need to establish that "but for" the misrepresentation, the application would have been

granted. *Kalejs v. INS,* 10 F.3d 441, 446 (7th Cir. 1993). Here, the Government asserts that Faris was "inadmissible" and statutorily ineligible for naturalization because he entered the United States using someone else's passport and visa, lied on his asylum application, and lied on his Adjustment of Status Application.

There is no dispute that Faris entered the United States in 1994 using another person's passport and visa. It is firmly established that an individual who knowingly enters the United States on a false passport has engaged in willful fraud and misrepresentation of material fact. *Esposito v. v. Immigration and Naturalization Service,* 936 F.2d 911, 912 (7th Cir.1991). Thus, Faris' fraudulent use of another individual's passport to enter the United States rendered him inadmissible and ineligible to adjust his status to permanent resident.

The Government correctly points out that Faris also made material misrepresentations on his asylum and adjustment applications when he stated that he had never "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the United States, or any other immigration benefit…" Chance Robinson, who adjudicated Faris' naturalization application, states in his sworn Declaration that had he known prior to adjudicating Faris' naturalization that, among other things, Faris had originally entered the United States in March 1994 using another person's passport and visa, he would not have approved his naturalization application on the day of his interview. Instead, Faris would have been referred for an exclusion hearing for violating immigration statutes (Doc. 66-3, paragraphs 15).

Because Faris undisputedly orchestrated his entry into the United States in 1994 through fraud and misrepresentations, he was inadmissible for permanent residency and the Government is also entitled to summary judgment on this point.

### *Count IV –Lack of Good Moral Character*

Finally, the Government argues that Faris lacked the requisite good moral character to naturalize because he lied during both his adjustment and naturalization interviews. To be statutorily eligible for naturalization, an individual must establish that during the time period prescribed by the statute, he "has been and still is a person of good moral character." 8 U.S.C. § 1427(a)(3). One cannot be regarded as a person of good moral character during the statutory period if he has given false testimony for the purpose of obtaining any immigration benefits. 8 U.S.C. § 1101(f)(6). In this context, the term "testimony" is limited to oral statements made under oath. *Kungys*, 485 U.S. at 780.

The false testimony need not be material. *Kungys*, 485 U.S. at 779. As the Supreme Court has explained, § 1101(f)(6) "denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Id.* at 780. Evidence that an individual knowingly made false statements during a naturalization interview demonstrates that they did so with the intent to obtain an immigration benefit. *See, e.g., Bijan v. United States Citizenship & Immigration Servs.*, 900 F.3d 942, 946 (7th Cir. 2018).

With respect to Faris, the statutory period during which good moral character was required began on January 14, 1996 – three years before the date his application for naturalization was filed with INS – and continued until he took the oath of allegiance on December 16, 1999. 8 U.S.C. §§ 1427(a)(3), 1430(a). The evidence establishes that during this time however, Faris gave false testimony under oath before adjustment-of-status and naturalization examiners in that he falsely represented he had never committed any crimes for which he had not been arrested even though he had used another's passport to enter the United States in 1994. His actions in 1994 were in fact crimes in violation of 18 U.S.C. § 1544 (misuse of a passport) and 18 U.S.C. § 1028 (fraud in

connection with identification documents), for which he was never arrested. Thus, the Government is entitled to summary judgment on the grounds asserted in Count IV as well.

## Conclusion

The United States of America has produced clear and unequivocal evidence that Defendant Iyman Faris obtained his naturalization unlawfully, and therefore, the Motion for Summary Judgment on Counts I, III, and IV is **GRANTED**.[3] Accordingly, the December 16, 1999 Court Order admitting Iyman Faris to citizenship is hereby **REVOKED** and the Certificate of Naturalization No. 23952581 is hereby **CANCELLED**.

All pending motions are **TERMINATED as MOOT**. The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**IT IS SO ORDERED.**

**DATED: February 3, 2020**

                                            **STACI M. YANDLE**
                                            **United States District Judge**

---

[3] The Government did not move for summary judgment as to Count II of the Complaint which alleged Faris procured his naturalization illegally by concealment of material facts and willful misrepresentations regarding his affiliation with extremist groups in Pakistan, Afghanistan, and Bosnia. As the other three Counts are dispositive of this case, the Court finds that Count II is MOOT.